650 A.2d 974

OWENS–ILLINOIS, INC., A CORPORATION DULY ORGANIZED UNDER THE LAWS OF THE STATE OF OHIO, PLAINTIFF–RESPONDENT, v. UNITED INSURANCE CO., A CORPORATION DULY ORGANIZED UNDER THE LAWS OF THE BRITISH WEST INDIES; OWENS INSURANCE LIMITED, A CORPORATION DULY ORGANIZED UNDER THE LAWS OF BERMUDA; AND GENERAL REINSURANCE CORPORATION, A CORPORATION DULY ORGANIZED UNDER THE LAWS OF DELAWARE, DEFENDANTS–APPELLANTS, AND AMERICAN RISK MANAGEMENT, INC., A CORPORATION DULY ORGANIZED UNDER THE LAWS OF BERMUDA; INTERNATIONAL RISK MANAGEMENT LTD., A CORPORATION DULY ORGANIZED UNDER THE LAWS OF BERMUDA; AND ARMRISK, INC., A CORPORATION DULY ORGANIZED UNDER THE LAWS OF BERMUDA, DEFENDANTS, AND ALLSTATE INSURANCE COMPANY AND AMERICAN RE–INSURANCE COMPANY, INTERVENORS–APPELLANTS, AND CIGNA REINSURANCE COMPANY (FORMERLY INA REINSURANCE COMPANY), INTERVENOR.

Argued September 26, 1994—Decided December 22, 1994.

440

Stephen D. Cuyler argued the cause for appellant United Insurance Company (*Cuyler, Burk & Matthews,* attorneys; *Allen E. Molnar,* of counsel; *Mr. Molnar* and *Gregg S. Sodini,* on the briefs).

David R. Gross argued the cause for appellant General Reinsurance Corporation (*Budd Larner Gross Rosenbaum Greenberg & Sade,* attorneys; *Mr. Gross, Joseph J. Schiavone, Donald P. Jacobs, Vincent J. Proto,* and *Elda Beylerian,* on the briefs).

David J. D'Aloia argued the cause for intervenor-appellant Allstate Insurance Company (*Saiber Schlesinger Satz & Goldstein,* attorneys; *Mr. D'Aloia, Sean R. Kelly,* and *Michael J. Geraghty,* on the briefs).

William J. Brennan, III, submitted a brief on behalf of intervenor-appellant American Re–Insurance Company (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Mr. Brennan* and *Wendy L. Mager,* on the briefs).

Bertram E. Busch submitted briefs on behalf of appellant Owens Insurance Limited (*Busch and Busch,* attorneys; *Mr. Busch* and *Kenneth A. Levine,* on the briefs).

Andrew T. Berry argued the cause for respondent Owens–Illinois, Inc. (*McCarter & English,* attorneys; *Mr. Berry, Gita F. Rothschild,* and *John L. McGoldrick,* of counsel; *Mr. Berry, Ms. Rothschild, Anthony Bartell, Teresa L. Moore, Rosanne C. Baxter,* and *Anthony J. Del Piano,* on the briefs).

Gerald A. Hughes submitted a brief on behalf of *amicus curiae* Insurance Environmental Litigation Association (*Hughes & Hendrix,* attorneys).

Paul E. Breene and John A. MacDonald submitted a brief on behalf of *amici curiae* New Jersey Public Risk Managers Associa-

tion, Township of West Milford, Air Products and Chemicals, Inc., A.P. Green Industries, Inc., Allied Signal Inc., American Telephone and Telegraph Company, Inc., Armstrong World Industries, Inc., Asarco Incorporated, Asbestos Claims Management Corporation, The BOC Group, Inc., C.E. Thurston & Sons, Inc., Columbia Gas Transmission Corporation, Combustion Engineering, Inc., Dana Corporation, Dow Corning Corporation, Ferodo America, Inc., Flexitallic, Inc., Ford Motor Company, HM Holdings, Inc., ICI Americas Inc., International Business Machines Corporation, J.T. Baker, Inc., Lac D'Amiante Du Quebec, LTEE, Maremont Corporation, National Service Industries, Inc., Pfizer Inc., Public Service Electric & Gas Company, Rohm & Haas Company, Schering–Plough Corporation, Shook & Fletcher Insulation Company, T & N PLC, Union Carbide Chemicals and Plastics Company, Inc., United States Gypsum Company, United States Mineral Products Company, Warner–Lambert Company, Westinghouse Electric Corporation, Wheeling Pittsburgh Steel Corporation and Witco Corporation (*Anderson Kill Olick & Oshinsky, Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys for Westinghouse Electric Corporation; *Callahan, Delany & O'Brien,* attorneys for Combustion Engineering, Inc.; *Hannoch Weisman,* attorneys for HM Holdings, Inc.; *Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein,* attorneys for Witco Corporation, and *Rudolph J. Sanson,* attorney for United States Mineral Products Company).

The opinion of the Court was delivered by

O'HERN, J.

This appeal involves two aspects of a dispute between a manufacturer of an asbestos product and its insurers concerning the coverage afforded to the manufacturer under its liability insurance policies. First is the "trigger of coverage" issue, a shorthand expression for identifying the events that must occur during a policy period to require coverage for losses sustained by the policyholder. Second is the "allocation issue," which involves the scope of coverage afforded under a triggered policy. One ques-

tion, for example, in the case of gradually-inflicted injury or property damage triggering a number of successive policies is whether the policyholder may recover the sum of all the policies or some allocated portion of each policy. The case is complicated by the fact that the plaintiff-manufacturer used a "captive insurance company" to manage its risks and to acquire the subject policies. That captive company, a wholly-owned subsidiary of the manufacturer, was in form a shell that reinsured the risks with the various defendant insurance companies.

The Appellate Division has ordered a hearing, 264 *N.J.Super.* 460, 522, 625 *A.*2d 1 (1993), on issues of fraud related to the issuance of the policies in that officers of the manufacturing company or the captive company, interlocked as they were, may have failed to disclose fully the underwriting risks for which the manufacturer sought coverage. The court below also believed that "further airing" was necessary to resolve whether the manufacturer expected or intended that its product would cause injury. *Id.* at 515, 625 *A.*2d 1. Those and other issues decided by the Appellate Division are not part of this appeal.

I

**Background**

The facts of the case are set forth fully in the Appellate Division opinion. We recite only those facts necessary to our disposition. Because the issues of coverage arose on cross-motions for summary judgment, we may accept as true in this appeal of defendants all the evidence supporting plaintiff's position, as well as all legitimate inferences that may be deduced therefrom. *Boyer v. Anchor Disposal,* 135 *N.J.* 86, 88, 638 *A.*2d 135 (1994). For purposes of this appeal, then, we adopt generally the factual version of the case set forth in the briefs of the plaintiff-manufacturer, Owens–Illinois (O–I).

A.

The most salient feature of this case is that it concerns a decades-old manufacturing activity. From 1948 to 1958, O–I

manufactured and distributed Kaylo, a thermal insulation product containing approximately fifteen percent asbestos. Between 1948 and 1963, O–I was self-insured; it maintained no insurance to cover its products-liability losses but bore that risk itself. Products-liability law was at that time in its early stages. From September 1, 1963, to September 1, 1977, O–I was insured under excess indemnity (umbrella) insurance policies issued by the Aetna Casualty and Surety Company (Aetna). *Owens–Illinois, Inc. v. Aetna Casualty & Sur. Co.,* 597 *F.Supp.* 1515, 1517 (D.D.C.1984). Those Aetna policies contained a deductible, or "self-insured retention" (SIR), for each occurrence resulting in personal injury or property damage. The SIR was $100,000 from 1963 to 1970, and $250,000 from 1971 to 1977. Above the deductible amount, the policies provided that Aetna would cover O–I's "ultimate net loss" (defense costs and indemnity) up to the "aggregate annual" and "per occurrence" limits of the policies. The aggregate annual and per-occurrence limits, which were the same within each policy, ranged from $20 million to $50 million over the period of the insurance. *Id.* at 1517 n. 6.

In the mid–1970s, defendant American Risk Management, Inc., offered to develop a new program of insurance for O–I involving a captive insurance company. The captive company would be a subsidiary of O–I. For a fee, American Risk Management would manage the subsidiary and arrange to reinsure the policies with companies in the United States and abroad. In 1975, Owens Insurance Limited (OIL) was established as the captive insurance company and began providing O–I with a fire and extended peril reinsurance program and loss prevention services. In 1976, American Risk Management proposed that OIL also provide O–I's casualty insurance, including products-liability coverage.

In June 1977, O–I invited quotes from various sources, including American Risk Management, to replace its Aetna insurance coverage, which would expire September 1, 1977. The bid package solicited a comprehensive general liability (CGL) policy covering general and products liability. After receiving various proposals,

O–I accepted American Risk Management's proposal to provide a comprehensive liability insurance package. The scheme of coverage was for an SIR of $250,000 per occurrence; primary coverage above the SIR up to $1 million per occurrence; and excess umbrella coverage of $50 million. The excess umbrella policy limits increased from $50 million to $150 million during the period between 1977 and 1985. Defendant United Insurance Company (United) provided the primary coverage. OIL issued the excess umbrella policy and reinsured with various companies, including United and other defendants. We shall refer to the management company and the insurers and reinsurers collectively as the Insurance Companies. We do not decide any issues regarding the status of the individual companies.

### B.

Toward the end of 1977, O–I's in-house legal department became aware of a number of asbestos-related lawsuits involving the Kaylo product. Early in 1978, O–I gave notice of those claims to Aetna, its carrier from September 1, 1963, to September 1, 1977. Aetna took the position, with which O–I originally agreed, that the cases should be reported on a manifestation basis, that is, the policy in effect when the disease manifested itself should respond to the claim. Because most statutes of limitations were of at least several years in duration, O–I assumed that Aetna would be the responsible carrier. As a precaution, O–I also informed the Insurance Companies of the asbestos claims.

Aetna rejected the claims submitted to it because it insisted that the $250,000 SIR was a per-claim figure. It thus estimated that none of the claims could reasonably be thought to call for coverage under its policies. As claims continued to mount, O–I recognized that the claims were no longer the exclusive responsibility of Aetna because the manifestation dates were now presumed to be after September 1, 1977. Accordingly, in 1980 O–I gave formal notice to the Insurance Companies of the pendency of those asbestos claims. The Insurance Companies adopted the same position as had Aetna with respect to the $250,000 SIR. They

further maintained, however, that the trigger of coverage was the exposure to the product and not the manifestation of the disease. Because the exposures had presumably predated the issuance of the OIL policies, the Insurance Companies declined coverage.

By January 1980, O–I had established a $3 million reserve for general legal expenses, substantially generated by its growing number of asbestos cases.

In late November 1984, O–I sought a declaratory judgment from the Chancery Division that the two lead carriers, United and OIL, must provide coverage for O–I's asbestos-related personal-injury and property-damage claims. The other defendants joined or were joined in the proceedings.

## C.

In an early phase of the proceedings, Judge Keefe, then sitting as a Chancery Division judge, concluded that an "injury in fact" triggering coverage under the insurance policies occurs on the inhalation of asbestos fibers and continues up to and including manifestation of an asbestos-related disease. Following discovery, Judge Conley reaffirmed Judge Keefe's ruling and held all insurers whose policies were triggered to be jointly and severally liable to O–I to the extent of the policy limits. In addition, the court held that the continuous trigger should apply to claims for property damage.

The Chancery Division also resolved other issues that we do not review. Among those issues was whether the $250,000 SIR was on a per-occurrence or a per-loss basis. Because the vast majority of individual claims do not exceed $250,000, the Insurance Companies' position would have effectively eliminated coverage for most of the claims made against O–I. However, the courts below, consistent with other jurisdictions, see *Owens–Illinois v. Aetna, supra*, 597 *F.Supp.* at 1525, held that the $250,000 SIR applied not to individual claims but to the aggregate of exposures due to a single condition during the policy period. The Appellate Division held that "the manufacture and sale of Kaylo must be regarded as the single occurrence triggering liability for asbestos-related inju-

ry or damage. O–I's coverage is thus subject to a single deductible for each policy period." 264 *N.J.Super.* at 503, 625 *A.*2d 1.

In addition, the Chancery Division held, and the Appellate Division agreed, that certain exclusions in the policies were either internally contradictory or ineffective. Those questions of policy construction pertaining specifically to the policies in this case were not of such public importance as to warrant review under *Rule* 2:12–4. However, the Appellate Division did agree with the Insurance Companies that disputed issues of fact existed that required further hearings on certain other coverage issues. 264 *N.J.Super.* at 521–22, 625 *A.*2d 1. The issues of expected or intended environmental injury should be more readily resolved in light of this Court's decision in *Morton International, Inc. v. General Accident Insurance Co. of America,* 134 *N.J.* 1, 629 *A.*2d 831 (1993), *cert. denied,* —— U.S. ——, 114 *S.Ct.* 2764, 129 *L.Ed.*2d 878 (1994).

The economic realities of this litigation are stark. By 1991, when O–I filed its Appellate Division briefs, it had settled 43,000 bodily-injury lawsuits. More than 90,000 bodily-injury and sixty-three property-damage cases were pending in all states and some territories. With bodily-injury lawsuits accumulating at the rate of 1700 per month, O–I's unreimbursed costs of defending and settling those cases had by then exceeded $95 million. O–I had already spent close to $10 million in defense and settlement costs associated with the property-damage cases. The questions raised here concern which of the insurance policies issued from 1977 to 1985 provide indemnity to O–I and to what extent.

Our grant of certification, 135 *N.J.* 301, 639 *A.*2d 301 (1994), was limited to two issues: (1) the application of the "continuous trigger" theory, and (2) any consequent apportionment of liability.

## II

### The Policy Language

The source of any duty on the part of the Insurance Companies to defend actions or to pay any judgments is obviously in the

contract of insurance. The United policy language pertinent to the trigger-of-coverage issue is as follows:

> The [insurance] company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay, either by adjudication or settlement, as damages because of personal injury or property damage * * * to which this insurance applies, caused by an occurrence and the [insurance] company shall indemnify the insured for costs associated with the defense of any suit or claim against the insured seeking damages on account of such personal injury or property damage * * *.

The OIL policy provides:

> The [insurer] will indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of:
>
> A. Personal Injury [or]
>
> B. Property Damage * * *
>
> to which this policy applies, caused by an occurrence * * *.

Both the United and OIL policies are subject to policy limits and certain exclusions. Although they are not boilerplate policies, they closely resemble a standard CGL policy.

The United policy contains the following definitions: An "occurrence" means "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoin[t] of the Insured." "Bodily injury" means "bodily injury, sickness or disease sustained by any person which occurs during the policy period * * *." "Property damage" means "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom * * *." The corresponding definitions in the OIL policy are similar.

The policies do not refer to a "trigger"; "the term 'trigger' is merely a label for the event or events that under the terms of the insurance policy determines whether a policy must respond to a claim in a given set of circumstances." Robert D. Fram, *End Game: Trigger of Coverage in the Third Decade of CGL Latent Injury Litigation, in* 10th Annual Insurance, Excess, and Reinsurance Coverage Disputes 9 (PLI Litig. & Admin. Practice

Course Handbook Series No. 454, 1993), *available in* WESTLAW, PLI–LIT Database, *2–3.

> The "trigger" is plain when these three policy provisions are combined: the carrier must pay for "all sums which the insured shall become legally obligated to pay as damages because of ... [injury ... sustained by any person which occurs during the policy period] or [injury to ... property which occurs during the policy period], caused by [an accident, including continuous or repeated exposure to conditions]...." In short, CGL policies provide coverage for property damage or bodily injury that "occurs" during the policy period.
>
> [*Id.* at *3.]

Despite the relative familiarity of these concepts, the one hundred or so pertinent words in the coverage clause have spawned "a bewildering plethora of authority" interpreting their meaning. *Gottlieb v. Newark Ins. Co.,* 238 *N.J.Super.* 531, 534 (App.Div. 1990).

To place the issues in context, we shall use an example to which most of us can relate. (The example is intended not to suggest that workers might in fact contract disease in the manner as stated but only to simplify our analysis.) Assume that a group of workers occupied an office building for nine years under the following circumstances. For the first three years, the building owners had no liability insurance, assuming any risk of loss. During each of the middle three years, the owners were insured under a CGL policy with the Trustworthy Insurance Company for $5,000,000 per occurrence. For the remaining three years of the period, the owners were again uninsured. Assume, too, that during the first three years the building occupants were exposed to asbestos fibers in the ceilings and insulation but that all asbestos products were removed at the end of the third year. During the first three years, no occupants of the building manifested any symptoms of disease. During the fourth, fifth, and sixth years, there was "exposure in residence," that is, some building occupants began to develop breathing problems, but no disease was diagnosable. In the final three years, some of the building's occupants were diagnosed with asbestos-related diseases.

In the tenth year the owners received claims from thirty people who had worked in the building during the entire nine years asserting that they were suffering from asbestos-related disease as a result of their work environment. The owners, when presented with the claims, no longer had insurance. They sought coverage, however, for all the claims from the Trustworthy Insurance Company, which had insured the owners for three of the nine years—years when the building contained no asbestos. Must Trustworthy respond to the claims? If so, to what extent?

Trustworthy's CGL policy is as broad as those in this case. The policy promised that the company would pay all sums that the insured should become legally obligated to pay as damages for bodily injury caused by an occurrence during the policy period. Each of the thirty claimants in our hypothetical might recover from the owners a large sum, let us say $500,000, for a total of $15,000,000 in damages. Was there an occurrence during the fourth, fifth, and sixth years that calls for full indemnity? The owners contend that the fibers once inhaled by the building occupants continued to cause injury to the occupants during those middle years, and that they paid premiums to cover their risk of liability for injury during those three years even if caused by earlier exposure. The owners seek indemnity to the extent of the full $5,000,000 for each year of coverage, for a total of $15,000,000. The first question is: Were the policies issued in the middle years "triggered"?

## III

### Trigger of Coverage

#### A.

Not surprisingly, the answer to the trigger-of-coverage question varies by jurisdiction. The most frequently offered theories for the trigger of coverage are (1) the exposure theory, (2) the manifestation theory, and (3) the continuous-trigger theory. A concise summary of these approaches is contained in a law

review article cited by the respected Judge Jack B. Weinstein of the Eastern District of New York in *Uniroyal, Inc. v. Home Insurance Co.*, 707 *F.Supp.* 1368, 1387 (1988), a case concerning coverage for toxic-induced disease related to Agent Orange:

Fixing the date of an injurious occurrence is crucial to determining which of the several insurers in a company's history must bear the liability for an environmental incident. Injuries from toxic wastes usually evolve slowly, and thus it is difficult to define the date on which an occurrence triggers liability for insurance purposes. Many years may pass from the time a toxin enters the body until the time the toxin's presence manifests itself in the form of a disease. The word "occurrence" itself is ambiguous because the injury process is not a definite, discrete event. Courts have set the time of occurrence in three ways: at the date of exposure, at the date of manifestation, and over the continuous period from exposure to manifestation (the "continuous trigger" rule).

The exposure theory holds that the date of occurrence is the date on which the injury-producing agent first contacts the body. The leading case espousing this view is the Sixth Circuit's decision in *Insurance Co. of North America v. Forty–Eight Insulations, Inc.* [633 *F.*2d 1212 (6th Cir.1980), *clarified in part*, 657 *F.*2d 814 (6th Cir.), *cert. denied*, 454 *U.S.* 1109, 102 *S.Ct.* 686, 70 *L.Ed.*2d 650 (1981)]. The court in *Forty–Eight* found that the occurrence was the immediate contact of an asbestos fibre with the lungs, even though the disease took some time to develop. The court's central purpose was to maximize coverage: it chose the exposure theory because the plaintiff was effectively uninsured after 1976, and any other theory would have put the date of occurrence after 1976. In most toxic waste cases, however, when exposure is not discoverable until many years after the fact, the exposure rule will not provide a feasible method for insurers to monitor risks and charge appropriate premiums.

Courts have similarly adopted the manifestation theory for its expedience in maximizing coverage. In *Eagle–Picher Industries v. Liberty Mutual Insurance Co.* [682 *F.*2d 12 (1st Cir.1982), *cert. denied*, 460 *U.S.* 1028, 103 *S.Ct.* 1279, 75 *L.Ed.*2d 500 (1983)], the First Circuit argued that the injury resulting from inhalation of asbestos fibres did not "occur" until the disease manifested itself. The court took note of the *Forty–Eight* opinion but distinguished it on the ground that, given the particular facts before the court, the manifestation rule would maximize coverage. In most cases, however, a manifestation rule would reduce coverage: insurers would refuse to write new insurance for the insured when it became apparent that the period of manifestations, and hence a flood of claims, was approaching. The insured would be left without coverage for victims whose diseases were not yet manifested.

The continuous trigger theory has also been justified by its ability to maximize coverage in particular cases. In *Keene Corp. v. Insurance Co. of North America* [667 *F.*2d 1034 (D.C.Cir.1981), *cert. denied*, 455 *U.S.* 1007, 102 *S.Ct.* 1644, 71 *L.Ed.*2d 875 (1982)], the District of Columbia Circuit held that because asbestos-related disease develops slowly, the date of the occurrence should be the continuous period from exposure to manifestation. It held all the insurers over that

period liable for the continuous development of the disease. Again, the court relied on the presumption of maximizing coverage. Because it avoids the dangers of the manifestation rule, and because it encourages all insurers to monitor risks and charge appropriate premiums, the continuous trigger rule appears to be the most efficient doctrine for toxic waste cases.

[*Developments in the Law—Toxic Waste Litigation*, 99 *Harv.L.Rev.* 1458, 1579–81 (1986) (footnotes omitted).]

The conceptual underpinning of the continuous-trigger theory, then, is that injury occurs during each phase of environmental contamination—exposure, exposure in residence (defined as further progression of injury even after exposure has ceased), and manifestation of disease.

■ At least two other less-frequently followed theories exist. One is the "injury-in-fact" (or "damages-in-fact") approach, which holds that coverage is triggered by a showing of actual injury or damage-producing event. *See, e.g., American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 *F.Supp.* 1485 (S.D.N.Y.1983), *aff'd as modified*, 748 *F.*2d 760 (2d Cir.1984). Under that theory, coverage is triggered by "a real but undiscovered injury, proved in retrospect to have existed at the relevant time * * * irrespective of the time the injury became manifest." *Id.* at 1497. "That is, after an injury has been diagnosed, it may be inferred, from the nature of the gestation period and from the stage of the illness, that the harm actually began sometime earlier." *Armstrong World Indus., Inc. v. Aetna Casualty & Sur. Co.*, 25 *Cal.App.*4th 1316, 26 *Cal.Rptr.*2d 35, 52 (1993), *review granted sub nom. In re Asbestos Ins. Coverage Cases*, 27 *Cal.Rptr.*2d 488, 866 *P.*2d 1311 (1994).

■ Finally, the "double-trigger" theory holds that injury occurs at the time of exposure and the time of manifestation, but not necessarily during the intervening period. *E.g., Zurich Ins. Co. v. Raymark Indus., Inc.*, 118 *Ill.*2d 23, 112 *Ill.Dec.* 684, 695, 514 *N.E.*2d 150, 161 (1987).

The court in *Keene Corp. v. Insurance Co. of North America*, 667 *F.*2d 1034, 1041, 1048–49 (D.C.Cir.1981), *cert. denied*, 455 *U.S.* 1007, 102 *S.Ct.* 1644, 71 *L.Ed.*2d 875 (1982), relied on the presump-

tion of maximizing coverage, but that appears an uneven principle in this setting. To return to our example of the office building: Had we adopted the manifestation theory in an earlier effort to maximize coverage, the building owners in our hypothetical would be uncovered. Had we adopted, for the same reason, the exposure theory, the owners would be similarly uncovered. A rule of law premised on nothing more than the result-oriented goal of maximizing coverage has been described as "judicial legislation." *American Home Prods., supra,* 565 *F.Supp.* at 1512. A more consistent principle is required.

### B.

Certain things are well settled: As a general rule, the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time when the complaining party is actually damaged. *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.,* 98 *N.J.* 18, 483 *A.2d* 402 (1984). *Hartford* concerned the exposure of a child, Ann Marie Sherman, to the medication Atropisol, which resulted in the child's illness. Two companies had insured the drug's manufacturer at the different times of exposure to the drug and manifestation of illness. Each contended that the other was liable to indemnify the manufacturer. In adopting the opinion of Judge Skillman, then sitting in the trial court, we agreed that the occurrence triggering the indemnity policy was not the administration of the drug to Ann Marie but the time when her injuries manifested themselves.

> There is a solid line of case authority in this jurisdiction supporting Aetna's interpretation of the pertinent coverage language. *See e.g., Deodato v. Hartford Ins. Co.,* 143 *N.J.Super.* 396 [363 *A.2d* 361] (Law Div.1976) aff'd o.b. 154 *N.J.Super.* 263 [381 *A.2d* 354] (App.Div.1977); *Yarrington v. Camarota,* 138 *N.J.Super.* 398 [351 *A.2d* 353] (App.Div.1971); *Miller [Muller] Fuel Oil Co. v. Ins. Co. of North America,* 95 *N.J.Super.* 564 [232 *A.2d* 168] (App.Div.1967). In the *Miller [Muller] Fuel Oil* case the court stated:
>
> > As a general rule the time of the "occurrence" of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged. "The time of the accrual of the insured's liability is the determining factor, not the time of an

event which ultimately results in liability." [Citations omitted] [*Id.* at 579, 232 *A*.2d 168].

Later in the opinion the court said:

> The tort of negligence is not committed unless and until some damage is done. Therefore, the important time factor, in determining insurance coverage where the basis of the claim is *negligence,* is the time when the damage has been suffered. [*Id.* at 578, 232 *A*.2d 168].

[<em>Id.</em> at 27, 483 <em>A</em>.2d 402.]

The Insurance Companies maintain that *Hartford* is controlling and that "the time when the damage has been suffered" must be proven on a case-by-case basis in the tens of thousands of pending lawsuits to establish a duty to indemnify under the policies. (They do concede, however, that some generalized formula for progression might suffice.) *Hartford,* however, expressly declined to resolve the time of an occurrence in the case of progressive bodily disease. Judge Skillman explained:

> [T]he courts which have endorsed the "exposure" theory in the asbestosis cases have not said that mere exposure to a substance is a "bodily injury." That would be an untenable distortion of the policy language. Rather, those courts have concluded from medical testimony that the inhalation of asbestos causes immediate tissue damage, although the effects of that damage do not immediately manifest themselves, and that such tissue damage is a "bodily injury."

[<em>Id.</em> at 28, 483 <em>A</em>.2d 402.]

Hartford, the company on the risk when Ann Marie's illness became manifest, had simply failed to offer any evidence that the medication administered to the child had caused her any damage before the Hartford coverage took effect.

C.

The Insurance Companies insist that the record in this case is incomplete because it does not contain "medical testimony that the inhalation of asbestos causes immediate tissue damage." *Ibid.* However, Judge Keefe, the judge presiding over the early phase of this matter in the Chancery Division, had an extraordinary understanding of the nature of asbestos-induced disease. He was at that time presiding over the unified statewide administration of all asbestos trials, and had conducted many asbestos trials. He found

absolutely no basis for discovery on the issue of the nature of asbestos disease. I think the courts of this state, not only the trial and appellate level, but the Supreme Court level, have acknowledged the fact that asbestos disease is a progressive disease, and that there is insult to tissue upon inhalation, and the insult continues during the residency, and obviously bodily injury occurs during the entire period of time, up to and including the date of manifestation of the disease.

The "overwhelming weight of authority" elsewhere acknowledges the progressive nature of asbestos-induced disease, and affirms that " 'bodily injury' occurs when asbestos is inhaled and retained in the lungs." *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 *Md.* 44, 595 *A.*2d 469, 478 (1991). Generalities about asbestos may be overblown. *See Becker v. Baron Bros.*, 138 *N.J.* 145, 649 *A.*2d 613 (1994) (finding erroneous charge to jury that as matter of law any product containing asbestos, without regard to type of asbestos, was defective if it did not contain warning). Still, we are satisfied, like most American jurisdictions, that medical science confirms that some injury to body tissue occurs on the inhalation of asbestos fibers, and that once lodged, the fibers pose an increased likelihood of causing or contributing to disease. *Lloyd E. Mitchell, Inc., supra*, 595 *A.*2d at 478–81. See also *Fischer v. Johns–Manville Corp.*, 103 *N.J.* 643, 660–61 n. 2, 512 *A.*2d 466 (1986) in which we recognized the progressive nature of asbestos-related disease.

## D.

The record in this case is less persuasive on the issue of asbestos-related property damage. The underlying complaints against O–I allege that Kaylo damages buildings from the moment it is installed and that the damage continues throughout the period that Kaylo remains in a property. The Appellate Division held that "an ongoing process of property damage triggers every policy during the destructive process." 264 *N.J.Super.* at 510, 625 *A.*2d 1.

Other courts have applied multi-year triggers in cases of delayed manifestation of property-damage claims. In *Dayton Independent School District v. National Gypsum Co.*, 682 *F.Supp.*

1403, 1410 (E.D.Tex.1988), *rev'd on other grounds sub nom. W.R. Grace & Co. v. Continental Casualty Co.,* 896 *F.*2d 865 (5th Cir.1990), the court decided that property-damage claims triggered all insurance policies on the risk from installation through removal of the building products containing asbestos. In *Armstrong World Industries, supra,* the court concluded that when property damage takes place during several policy periods, "insurance coverage is triggered when any part of the damage—any release or reentrainment—takes place." 26 *Cal.Rptr.*2d at 88.

*Gottlieb, supra,* 238 *N.J.Super.* at 537–38, 570 *A.*2d 443, held that, pending a hearing to determine various factual matters, homeowners could, under a continuous-trigger theory, recover from a pest control company's earlier insurer for chemical poisoning. *Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co.,* 613 *F.Supp.* 1549 (D.N.J.1985), held that under New Jersey law the progressive nature of asbestos-related property damage triggers every policy on the risk from installation to removal. The court took judicial notice of the fact that asbestos products cause continuous property damage from installation until removal:

> It is recognized that there is a natural deterioration of asbestos-containing materials resulting in the release of fibers, release that may occur by a slow continuous degradation of the insulating surface which may be accelerated by the air movement and vibration which occurs in most buildings. More specifically, friable asbestos material breaks down as a result of vibrations, deterioration, or direct contact and damage and, as it ages, it can lose its cohesive strength. Fallout of fibers from deteriorating material is continuous.
>
> [613 *F.Supp.* at 1561 (citation omitted).]

Property-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos. Like a person exposed to toxic elements, the environment does not necessarily display the harmful effects until long after the initial exposure. "Thus, while property damage is not, of course, an insidious disease, many of the same considerations apply." *Ibid.* The court in *Armstrong World Industries, supra,* also recognized that property damage caused by asbestos might not be complete at installation. The California Court of Appeals in that case

agreed with the lower court's conclusions that property damage occurs not only at the time asbestos is installed, but also " 'at any time asbestos fiber or material is released from [asbestos-containing building material] into the air or on surfaces of the building, and when settled releases are disturbed and reentrained into the air.' " 26 *Cal.Rptr.*2d at 87 (quoting *Asbestos Insurance Coverage Cases,* Judicial Council Coordination Proceeding No. 1072, Super.Ct., San Francisco, Cal. Jan. 24, 1990). Although restricting trigger of coverage to periods of release or reentrainment, the court in *Armstrong World Industries* acknowledged that property damage caused by asbestos is "continual in that new episodes of releases or reentrainments of asbestos fibers may occur repeatedly over time." 26 *Cal.Rptr.*2d at 88.

O–I informs us that a small percentage of its asbestos-related expenditures has gone to satisfy property-damage cases. At least in the context of this case (in that no one suggests that the process was anything but continuous), we hold that claims of asbestos-related property damage from installation through discovery or remediation (the injurious process) trigger the policies on the risk throughout that period. There is some question about when the injurious process ends. We do not reach that issue in this opinion. We shall concentrate in this opinion primarily on the issues of asbestos-related personal injury.

### E.

Accepting that inhalation of asbestos fibers causes some injury to tissue, does that injury trigger coverage under a CGL policy? Many courts have answered that question by finding ambiguity in the language of the policy and construing the policy in favor of the policyholders. For example, the District of Columbia Circuit, which applied the continuous-trigger theory in *Keene, supra,* noted the difficulty of interpreting the typical language of a CGL policy:

The policy language does not direct us unambiguously to either the "exposure" or "manifestation" interpretation. In the context of asbestos-related disease, the

terms "bodily injury," "sickness" and "disease," standing alone, simply lack the precision necessary to identify a point in the development of a disease at which coverage is triggered. The fact that a doctor would characterize cellular damage as a discrete injury does not necessarily imply that the damage is an "injury" for the purpose of construing the policies. At the same time, the fact that an ordinary person would characterize a fully developed disease as an "injury" does not necessarily imply that the manifestation of the disease is the point of "injury" for purposes of construing the policies. In interpreting a contract, a term's ordinary definition should be given weight, but the definition is only useful when viewed in the context of the contract as a whole.

[667 *F*.2d at 1043.]

However, just as we did not find ambiguity in the language of the pollution-exclusion clause in *Morton International, supra,* 134 *N.J.* at 28–29, 629 *A.*2d 831, we do not find ambiguity in the language of the "occurrence" clause. The words are all familiar and easily understandable. "The plain meaning of the 'occurrence' clause is no secret to the parties." *American Home Prods., supra,* 565 *F.Supp.* at 1497.

What is not so easily understandable is the point at which the law will say that injury requires indemnity. In that sense, the concept of injury, like the related concepts of duty and causation, is an instrument of policy. After all, the air we breathe and the water we drink contain trace elements of toxic substances. The law decides when an invasion of the body constitutes an injury entitling one to damages.

In addition, injury may mean different things in different contexts. For example, in *Coughlin v. Owens–Illinois, Inc.,* 26 *Cal.App.*4th 1511, 27 *Cal.Rptr.*2d 214, 228 (Ct.App.1993), *review granted,* 29 *Cal.Rptr.*2d 538, 871 *P.*2d 1134 (Cal.1994), O–I contended that for purposes of determining the effective date of California's Proposition 51, modifying rules of common-law liability, an action for asbestos-related injury accrues when disease is diagnosed or discovered, a position different from that which it holds today. *See also Owens–Illinois, Inc. v. Armstrong,* 326 *Md.* 107, 604 *A.*2d 47, 53, *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 204, 121 *L.Ed.*2d 145 (1992) (rejecting O–I's argument regarding applicability of newly-established cap on non-economic damages that action

for asbestos-related injury did not arise until claimant was first diagnosed with asbestosis).

Our own law has drawn the line on liability to indemnify for injury in different ways in different contexts. In *Ayers v. Township of Jackson*, 106 *N.J.* 557, 598–99, 525 *A.*2d 287 (1987), we concluded that absent diagnosed disease, the ingestion of toxic substances that enhanced the risk of progressive growth of cancer did not constitute a legal injury warranting compensation. In *Mauro v. Raymark Industries, Inc.*, 116 *N.J.* 126, 561 *A.*2d 257 (1989), we held that even when the body suffered diagnosable injury due to asbestos exposure (thickening of chest walls and calcification of diaphragm), the injury was insufficient to allow recovery for the enhanced risk of contracting cancer.

What we did, however, in the face of doubtful scientific premises was to adapt our law to the uncertainties of medical causation. In *Ayers, supra,* we held that even when there is no bodily injury (or none that can be found), "the public health interest may justify judicial intervention even when the risk of disease is problematic." 106 *N.J.* at 605, 525 *A.*2d 287. We said that "mass-exposure toxic-tort cases involve public interests not present in conventional tort litigation." *Id.* at 609, 525 *A.*2d 287. We thus allowed tort recovery for medical-surveillance damages even without evidence of physical injury. *Id.* at 610–11, 525 *A.*2d 287. In *Mauro* we relaxed our statute of limitations and single-controversy doctrines to allow victims to assert later claims when the foreshadowed disease eventually occurs. In candor, we "acknowledge[d] that our resolution of [that] issue [was] imperfect." 116 *N.J.* at 143, 561 *A.*2d 257.

So too here, our resolution of the issues is necessarily imperfect. Our concepts of legal causation were developed in an age of Newtonian physics, not of molecular biology. Were it possible to know when a toxic substance clicks on a switch that alters irrevocably the composition of the body and before which no change has "occurred," we might be more confident that occurrence-causing damages had taken place during a particular policy

period. The limitations of science in that respect only compound the limitations of law. See Comment, *Judicial Attitudes Towards Legal and Scientific Proof of Cancer Causation*, 3 Colum.J.Envtl.L. 344, 347 (1977) (outlining theories of how mutations produce a cancerous cell).

Mass-exposure toxic-tort cases have simply exceeded the capacity of conventional models of judicial response.

> The overwhelming conclusion of the commentators who have evaluated the result is that * * * common-law tort doctrines are ill-suited to the resolution of such injury claims, and that some form of statutorily-authorized compensation procedure is required if the injuries sustained by victims of chemical contamination are to be fairly redressed.
>
> [*Ayers, supra*, 106 *N.J.* at 581, 525 *A.*2d 287.]

No such procedure has been forthcoming. Hence, courts must adapt common-law doctrines "to the peculiar characteristics of toxic-tort litigation." *Ibid.* We advert to those principles because we believe that common-law resolution of the trigger-of-coverage issue requires that we consider, at the same time, the issue of scope of coverage if a policy is triggered. "[T]he choice of trigger theory is related to the method a court will choose to allocate damages between insurers." *Northern States Power Co. v. Fidelity and Casualty Co. of New York*, 523 *N.W.*2d 657 (Minn.1994).

## IV

### Scope of Coverage

#### A.

*Joint-and-Several Allocation*

Assuming that every phase from exposure to manifestation of disease is a period of continuous bodily injury, does that trigger the sum of all policies in force during the years of exposure, exposure in residence, and manifestation? Recall that in our hypothetical the building owners were insured only during the middle three years of the workers' occupancy. *Keene, supra*, 667 *F.*2d 1034, is the leading case for the proposition "that any triggered policy must respond for the entirety of a claim, subject

to the effect of 'other insurance clauses' and principles of equitable contribution, but without assigning responsibility for a portion of coverage to the policyholder even if it were uninsured or self-insured." David W. Steuber, et al., *Emerging Issues in Environmental Insurance Coverage Litigation, in* Fifth Annual Litigation Management Supercourse 331 (PLI Litig. & Admin. Practice Course Handbook Series No. 496, 1994), *available in* WESTLAW, PLI–LIT Database, *60. *Monsanto Co. v. C.E. Health Compensation and Liability Insurance Co.,* —— A.2d ——, n. 6 (Del.1994), describes the *Keene* rule as the "majority rule," citing, among other authorities, *ACandS Inc. v. Aetna Casualty & Surety Co.,* 764 *F.*2d 968, 974 (3d Cir.1985); *Zurich Insurance Co., supra,* 112 *Ill.Dec.* at 699, 514 *N.E.*2d at 165; and *J.H. France Refractories Co. v. Allstate Insurance Co.,* 534 *Pa.* 29, 626 *A.*2d 502, 508 (1993). *Sandoz, Inc. v. Employer's Liability Assurance Corp.,* 554 *F.Supp.* 257, 266 (D.N.J.1983), accepted that in certain cases medical evidence might establish the extent to which bodily damage occurred during a policy period, thus allowing for apportionment. In default of such evidence, it accepted the *Keene* approach.

The conceptual model employed by the *Keene* court is that of a pleated accordion surrounding the entire "occurrence" and representing the time span from exposure to manifestation. Its solution to the problem of indivisible injury was to collapse the injuries in the accordion into a single year. It wrote:

> The principle of indemnity implicit in the policies requires that successive policies cover single asbestos-related injuries. That principle, however, does not require that Keene be entitled to "stack" applicable policies' limits of liability. To the extent possible, we have tried to construe the policies in such a way that the insurers' contractual obligations for asbestos-related diseases are the same as their obligations for other injuries. Keene is entitled to nothing more. Therefore, we hold that only one policy's limits can apply to each injury. Keene may select the policy under which it is to be indemnified.
>
> [667 *F.*2d at 1049–50.]

That theory is sometimes referred to as one of joint-and-several allocation. The *Keene* court explained that it did not mean that a single insurer will be saddled with full liability for any injury.

*Keene* held that when more than one policy applies to a loss, the "other insurance" provisions of each policy provide a scheme by which the insurer's liability is to be apportioned. *Id.* at 1050.[1] The Appellate Division adopted the *Keene* theory of joint-and-several allocation.

What the *Keene* decision would mean in the context of our office-building example is not perfectly clear to us. By way of illustration, the *Keene* opinion states that "only one policy's limits can apply to each injury." *Id.* at 1049. But what did the *Keene* court mean by "injury"? Did it mean each claim of injury, or each cause of injury? Some language in the opinion has led commentators to believe it meant the latter: "The key to the *Keene* court's decision was its conclusion that there was only a single occurrence. The court's concern was that the insurers' liability for a long-term exposure injury be the same as their obligations for other types of losses." William R. Hickman & Mary R. DeYoung, *Allocation of Environmental Cleanup Liability Between Successive Insurers,* 17 *N.Ky.L.Rev.* 291, 301 (1990).

If the *Keene* court's concern was that the insurance companies' liability for long-term exposure to injury be the same as their obligations for other types of losses, only one policy's limits would seem to apply to all claims arising out of the same occurrence, as would have been the case had an asbestos-laden steam pipe exploded in the fourth year of our illustration, causing immediate injury to thirty of the building occupants. We surmise, however, that the *Keene* court's holding is that one policy's limits apply to each *claim* of injury, and that in our office-building hypothetical the building owner might have assigned ten of the claims to year four, ten to year five, and ten to year six. The cross-indemnity among the policies would neutralize the effect of contribution on policy limits. In *Air Products and Chemicals, Inc. v. Hartford*

---

[1] Because no specific allocation was made in *Keene,* the district court held on remand that a company whose policy was triggered was to make a claim against the other insurance companies without participation or involvement by Keene. Marcy L. Kahn, *The "Other Insurance" Clause,* 19 *Forum* 591, 612 (1984).

*Accident and Indemnity Co.*, 707 *F.Supp.* 762 (E.D.Pa.1989), *aff'd in part, vacated in part*, 25 *F*.3d 177 (3d Cir.1994), the district court applied a per-claim analysis to triggered policies but did not permit the policyholder the discretion to select the policy for coverage. Following Pennsylvania law, that court directed that "liability among triggered policies 'should be apportioned chronologically and seriatim.'" 707 *F.Supp.* at 769 (quoting *J.H. France Refractories Co. v. Allstate Ins. Co.*, No. 3933 (Phila.Ct.C.P. Apr. 18, 1986), *vacated on other grounds*, 372 *Pa.Super.* 575, 539 *A*.2d 1345 (1988), *rev'd*, 521 *Pa.* 91, 555 *A*.2d 797 (1989), *on remand*, 396 *Pa.Super.* 185, 578 *A*.2d 468 (1990), *aff'd in part, rev'd in part*, 534 *Pa.* 29, 626 *A*.2d 502 (1993)). The Third Circuit Court of Appeals in *Air Products and Chemicals* citing the Pennsylvania Supreme Court decision on this subject in the *J.H. France* litigation, 626 *A*.2d at 508, *supra*, rejected the lower court's apportionment method in favor of joint-and-several allocation allowing the insured to select the policy under which it is to be indemnified. 25 *F*.3d at 181.

One anomaly in the *Keene* court's analysis is that a single claim for the cost of cure of a long-term release of contaminants that polluted a city water supply would be limited to one policy's limits, whereas if 300 residential wells were affected, the limits of multiple policies would be available, though the occurrence (cause) was the same. Another anomaly is that although the opinion's premise is that all damages can be claimed in any one of the years, it nonetheless calls for contribution from other policies. By definition, if all damages occurred in one of the years (in the sense of that year's injury establishing the damages), none of the other policies would be triggered.

## B.

### Pro–Rata Allocation

Several courts selecting multi-year triggers of coverage have held that "triggered policies must respond to a claim on a prorated basis and that a policyholder is responsible for a portion of

indemnification and defense obligations as a result of periods of time when it was uninsured or self-insured." Steuber, *supra*, at *60. The leading case for that proposition is *Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 633 *F.*2d 1212 (6th Cir.1980), *clarified*, 657 *F.*2d 814 (6th Cir.), *cert. denied*, 454 *U.S.* 1109, 102 *S.Ct.* 686, 70 *L.Ed.*2d 650 (1981). Courts taking the same allocation approach as *Forty–Eight Insulations* include *Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 *F.*3d 365, 372 (5th Cir.1993) (apportioning cost of policy-holder's defense among insurers on risk; policyholder must bear its share of defense costs determined by fraction of time it lacked coverage) (applying Texas law); *Fireman's Fund Insurance Cos. v. Ex–Cell–O Corp.*, 685 *F.Supp.* 621, 626 (E.D.Mich.1987) (holding insurer on risk during period of alleged exposure liable for policy-holder's defense in proportion that period on risk bears to total period of alleged exposure; policyholder must bear pro-rata share of costs for uninsured periods); and *Northern States Power*, *supra*, 523 *N.W.*2d at 662 (allocating damages to insurers in proportion to time on risk; policyholder carrying only excess insurance must assume retained limit with respect to each policy).

*Forty–Eight Insulations* concluded that a reasonable means of allocating costs among the triggered policies was available based on the number of years of exposure. 633 *F.*2d at 1225. (The policyholder disputed only the allocation of defense costs in the Court of Appeals in *Forty–Eight Insulations*.) In *Uniroyal*, *supra*, 707 *F.Supp.* 1368, Judge Weinstein applied a different formula because evidence was available to differentiate between the various periods of coverage. He applied a pro-rata method under which the loss would be allocated to each policy according to the portion of injuries triggering that policy. *Id.* at 1393. He resolved that portion by the quantity of the substance released during the policy periods. *Id.* at 1393–94. He appeared to reject the *Keene* theory of joint-and-several liability

because for one period the manufacturer had had no insurance, and the *Keene* court viewed its mission as ensuring that the manufacturer received complete indemnity for all its asbestos-related losses. A firm that fails to purchase

insurance for a period, however, is self-insuring for all the risk incurred in that period; otherwise it would be receiving coverage for a period for which it paid no premium. Self-insurance is called "going bare" for a reason.

[*Id.* at 1392 (citation omitted).]

In *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.*, 258 *N.J.Super.* 167, 222–23, 609 *A.*2d 440 (App.Div. 1992), *certif. denied*, 134 *N.J.* 481, 634 *A.*2d 528 (1993), the Appellate Division, applying New York law, let stand a similar allocation among policies covering liabilities for dispersal of Agent Orange.

## C.

*Does the Language of the Policies Resolve the Allocation Issue?*

Each side relies on the same language in the policies. O–I emphasizes that the language is unambiguous, the meaning clear. It contends that once a policy is triggered, an insurance company is liable, under the United policy, for "all sums which the insured shall become legally obligated to pay * * * as damages," and under the OIL policy, for "the sum actually paid * * * in the settlement or satisfaction of any claim or suit." The policies do not state that the insurer shall pay only *some* of the damages sustained, or that the insurers must pay only a portion of the ultimate net loss sustained during the policy period. Instead, the policies expressly require that when personal injury or property damage occurs during a policy period, the insurers must pay *all* sums resulting from that injury or property damage.

The Insurance Companies emphasize with equal certainty that the language of the policies is clear. They insist that the Appellate Division's opinion ignores the plain language of the policies and applicable law. They contend that in its citation of the policy language, the Appellate Division omitted the language limiting the insurers' liability to injury "which occurs during the policy period."[2] For example, the United policy, after reciting that the

---

[2] The Appellate Division wrote:

company would pay "all sums which the insured shall become legally obligated to pay * * * as damages because of personal injury or property damage," qualified that statement by its definition that "[t]his insurance applies only to personal injury or property damage which occurs during the policy period * * *." Similarly, the OIL excess policy states that it "applies only to personal injury * * * which occurs during the policy period * * *." Property damage is defined in the OIL policy as "physical injury to or destruction of tangible property which occurs during the policy period * * *." The policies do not apply to injuries that occur outside the policy period. Coverage is provided only for personal injury or property damage "to which this insurance applies" and the insurance "applies" only to personal injury or property damage "which occurs during the policy period." The policy language, the Insurance Companies urge, leaves no doubt that coverage is not afforded for any injury or damage taking place outside the policy period.

Both arguments are flawed. As to the Insurance Companies' argument that all injury (or damages) must occur in the policy period or that indemnity is awarded for only the part of the injury that occurs during the policy period, consider the simple case of an automobile accident in 1994 with a definite prognosis that an injured occupant's spine will deteriorate in 1996 resulting eventually in paralysis. The policy in effect during 1994 must indemnify for all damages attributable to the 1994 accident even though the full extent of the damages or the injury will not take place until a future date. Conversely, to convert the "all sums" or "ultimate net loss" language into the answer to apportionment when injury

---

We begin our analysis with the policy language. In the United policy, the insurer agreed to pay "all sums which [O–I] shall become legally obligated to pay ... as damages because of *personal injury* or *property damage* ... caused by an *occurrence.*" The OIL policy similarly contains an agreement to indemnify O–I for the ultimate net loss it "becomes legally obligated to pay as damages because of personal injury [or] property damage." The language is unambiguous.

[264 *N.J.Super.* at 505, 625 *A.2d* 1.]

occurs over a period of years is like trying to place one's hat on a rack that was never designed to hold it. It does not work. The language was never intended to cover apportionment when continuous injury occurs over multiple years. In addition, the argument that all sums to be assessed because of long-term exposure to asbestos could have been established in any one of the policy years is intuitively suspect and inconsistent with our developing jurisprudence in the field of toxic torts. *Supra* at 458, 650 *A.*2d at 985, citing *Ayers, supra,* 106 *N.J.* 557, 525 *A.*2d 287, and *Mauro, supra,* 116 *N.J.* 126, 561 *A.*2d 257.

The problem is how to apply the abstract concepts of law and the related provisions of the insurance contract to the realities of environmental disease. The legal concepts of injury, defect, negligence, and damages are well-suited to the prototype accident of an exploding steam boiler. A defective weld in a boiler may have been present years before but the occurrence (an explosion) and the attendant injuries are easily identified as falling within a particular policy period. Even though "all sums" due from the accident might not be known with certainty at the time of the explosion, by the time of trial a claimant would be able to establish, within a reasonable degree of medical probability, what damages would flow from the injury.

That is not so in the case of gradual release of contaminants. Even in cases such as *Ayers, supra,* 106 *N.J.* 557, 525 *A.*2d 287, in which bodies were admittedly exposed to damaging contaminants, "all sums" due because of the injury simply cannot be determined in each of the years of exposure or exposure in residence, and perhaps not even when there has been a manifestation.

In a refreshing display of candor, Judge Barry acknowledged in *Lac d'Amiante du Quebec, supra,* 613 *F.Supp.* at 1551, that the differing interpretations of which occurrence constitutes the injury contemplated by the language of insurance policies is "due, in part, to the desire of some courts to maximize coverage even when to do so requires judicial sleight of hand." It was precisely that "sleight of hand" or "leap of logic" that all the damages can be thought to

be imposed in any one of the years of exposure or release that led Judge Wald to depart from the majority of her court in *Keene, supra,* 667 *F.*2d at 1058 n. 7. The truth of the matter is undoubtedly that some of the damages (at least in the case of personal injury) occur in each of the years of the exposure in residence. Hence, Judge Wald was unable to agree with that aspect of the majority opinion as it applied to the uninsured period prior to the time when coverage for asbestos damages could no longer be obtained. She wrote: "I just do not understand why an asbestos manufacturer, which has consciously decided not to in-: sure itself during particular years of the exposure-manifestation period should have a reasonable expectation that it would be exempt from any liability for injuries that were occurring during the uninsured period." *Id.* at 1058. She found it thus logical and fair to adopt a pro-rata allocation formula similar to the result in *Forty–Eight Insulations.*

## V

### The Reasons for Our Decision

No great difference in principle divides *Keene* and *Forty–Eight Insulations.* Using either method, allocation will exist among the insurance companies on the risk. And using either method, the use of a multi-year trigger will not end the litigation. The real difference between *Keene* and *Forty–Eight Insulations* is in their treatment of periods of self-insurance. Each court was equally certain that the policy language dictated the result. *Forty–Eight Insulations* said that "it requires only a straightforward interpretation of the policy language for us to adopt the exposure theory." 633 *F.*2d at 1222. Once the exposure theory was adopted, proration followed, in its view, because "[a]n insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period." *Id.* at 1224–25. *Keene* said: "As we interpret the policies, they cover Keene's entire liability once they are triggered. That interpreta-

tion is based on the terms of the policies themselves." 667 *F.*2d at 1048.

We are unable to find the answer to allocation in the language of the policies. The occurrence clauses undoubtedly contemplated indemnity for provable damages incurred by the policyholder because of injury that occurred during the policy period. The continuous-trigger theory coupled with joint-and-several liability is premised on a tenuous foundation: that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same (the collapsed accordion). As we have seen, our law has been developing in a different manner.

Some drafting history suggests that more than one year's policy would be applicable in the case of progressive environmental disease. The O–I briefs refer us to industry-group acknowledgments in 1977 that coverage existed for each carrier throughout the period of time an asbestosis condition developed, that is, from the first exposure through the discovery and diagnosis. A majority of that same group also contended that each carrier on risk during any part of the period could be fully responsible for the cost of defense and loss. (The Insurance Companies' response is that those views were predictions of what courts might do, rather than what courts should do.)

On other occasions insurance industry officials acknowledged that multiple policies of insurance would be triggered by a gradual release of contaminants causing progressive injury or damage. See Eugene R. Anderson, et al., *Liability Insurance Coverage for Pollution Claims,* 59 *Miss.L.J.* 699, 729–30 (1989) (quoting (1) Gilbert L. Bean, a drafter of the CGL policy: "[I]f the injury or damage from waste disposal should continue after the waste disposal ceased, as it usually does, it could produce losses on each side of a renewal date, and in fact over a period of years, with a separate policy applying each year."; (2) a company claims manual: "When the injury is gradual, resulting from continuous or repeated exposures, and occurs over a period of time, coverage

may be afforded under more than one policy—the policies in effect during the period of injury"; and (3) another drafter of the CGL policy: "[T]here is no pro-ration formula in the policy, as it seemed impossible to develop a formula which would handle every possible situation with complete equity.")

Still, to say that coverage is afforded under more than one policy seems different from saying that a policyholder may stack the limits of all the policies in effect during a period of repeated or continuous exposure. The *Keene* court declined to make such an interpretation, at least in the context of a single claim as for governmental cleanup costs at a landfill site.

Other drafting history reflects the considerations that went into the writing of the occurrence clause. If the drafters had chosen the manifestation-of-disease single trigger, insurance companies would have been encouraged to "dump" risks when the first few cases of occupational disease appeared. *American Home Prods., supra,* 565 *F.Supp.* at 1501. Perhaps the drafters sensed, too, a corresponding inequity in absolving from responsibility carriers on the risk during early years of exposure. If absolved during periods of early exposure, those carriers would have less incentive to monitor the risks insured. See *Developments in the Law, supra,* at 1577–81. Although the drafters seemed to acknowledge that some continuum existed between exposure and manifestation of disease when coverage was provided, they did not (or could not) decide how to apportion the responsibility. Almost wistfully, one of the drafters acknowledged that at one time in the process, they sought a "simple approach that would allow some latitude in each case for the courts to make an equitable decision on the facts." Memorandum from George Katz, et al. to National Bureau of Casualty Underwriters, Joint Forms Committee 2 (Apr. 17, 1961), *quoted in* Eugene R. Anderson, *History of Disputed Provisions of the 1966 Standard Form Comprehensive General Liability Insurance Policy, Drafting History, Sales History and Historical Review of Commentators, in* Insurance, Excess, and Reinsurance Coverage Disputes 1989, at 203 (PLI Litig. & Admin. Practice

Course Handbook Series No. 369, 1989), *available in* WESTLAW, PLI–LIT Database, *7.

Except for periods of self-insurance involved, the *Keene* court sought to reach an equitable decision on the facts apportioning the damages among the successive carriers. Although it collapsed the injury/occurrence into a single year, the *Keene* court allowed contribution from the policies in force in the other years.

However, that court's invocation of the "other insurance clauses" in the policies is strained. Historically, "other insurance" clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a given loss. Kahn, *supra,* at 591–92. An example of a typical multiple-coverage case is the situation in which a loss is incurred by an insured driver while driving an automobile of an insured owner with the owner's permission. 3 Rowland H. Long, *The Law of Liability Insurance* § 22.01 (1992). In such a case both policies clearly cover the entire loss.

> [T]here are three general types of "other insurance" clauses—excess, pro rata and escape. Excess insurance "kicks in" to provide additional coverage once the policy limits of other available insurance are exhausted. Pro rata provisions allocate financial responsibility between concurrent policies based upon the percentage of coverage each policy bears to the net amount of coverage under all applicable policies. An escape clause attempts to release the insurer from all liability to the insured if other coverage is available.
>
> [*Contrans, Inc. v. Ryder Truck Rental, Inc.,* 836 F.2d 163, 166 (3d Cir.1987).]

Generally speaking, pro-rata provisions are intended to apply only "when the coverage is concurrent." *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.,* 919 F.2d 235, 241 (4th Cir.1990). If the policies do not overlap, such clauses are not generally applicable. *Ibid. But see Glacier Gen. Assurance Co. v. Continental Casualty Co.,* 605 F.Supp. 126, 130 n. 6 (D.D.C.1985) (explaining *Keene* as having "rendered much of traditional insurance law inapplicable" and adopting its own analysis for proration of loss when two consecutive malpractice policies are triggered, one by "medical incident" and the other by "bodily injury" during the policy period). The *Glacier* court declined to give effect to an "other insurance" provision that would have withdrawn coverage

"if other valid insurance exists." 605 *F.Supp.* at 130–31. In the absence of other grounds for decision, the *Glacier* court decided to prorate evenly the loss between the two insurance companies. *Id.* at 132.

The other usual principles of interpretation of contracts of insurance do not provide much guidance. As the Appellate Division noted, "O–I was a sophisticated insured and cannot seek refuge in the doctrine of strict construction by pretending it is the corporate equivalent of the unschooled, average consumer." 264 *N.J.Super.* at 489, 625 *A.*2d 1. Assessing the objectively reasonable expectations of a policyholder in this context of long-tail injuries is also very difficult. *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 330, 495 *A.*2d 406 (1985). At least in the case of property damages due to environmental contamination, the retroactive imposition of absolute liability under laws like CERCLA, 42 *U.S.C.* §§ 9601–9675, was surely unknown, if not unknowable.

And the doctrine of *contra preferentem*, construing any ambiguity against the insurer as drafter, *Uniroyal, supra,* 707 *F.Supp.* at 1376, can produce uneven results. For example, in *Eagle–Picher Industries v. Liberty Mutual Insurance Co.*, 523 *F.Supp.* 110 (D.Mass.1981), *aff'd as modified,* 682 *F.*2d 12 (1st Cir.1982), *cert. denied,* 460 *U.S.* 1028, 103 *S.Ct.* 1280, 75 *L.Ed.*2d 500 (1983), the insured preferred a manifestation theory. (On appeal, the insured in *Eagle–Picher* advocated the continuous-trigger theory. 682 *F.*2d at 16.) In *Forty–Eight Insulations, supra,* 633 *F.*2d 1212, the exposure theory afforded the insured the most coverage. To have shifting rules of interpretation that depend on the configuration of insurance coverage is unacceptable to us.

The language of the policies does not itself yield either result and the usual rules of interpretation are less helpful in this context. See Note, *Adjudicating Asbestos Insurance Liability: Alternatives to Contract Analysis,* 97 *Harv.L.Rev.* 739, 743 (1984), observing that traditional techniques of contract interpretation "cannot produce a coherent result." Therefore, the public interest factors set forth in *Ayers, supra,* 106 *N.J.* at 608–10, 525 *A.*2d 287,

serve to guide us. Among the factors that we should consider is the extent to which our decision will make the most efficient use of the resources available to cope with environmental disease or damage. *Id.* at 608, 525 *A.*2d 287. One of the principles of such decision-making is to provide incentives that parties should engage in responsible conduct that will increase, not decrease, available resources. *See* Douglas L. Hallett & Lawrence C. Berney, *Trigger of Coverage: A Posnerian Analysis, in* 10th Annual Insurance, Excess, and Reinsurance Coverage Disputes 39 (PLI Litig. & Admin. Practice Course Handbook Series No. 454, 1993), *available in* WESTLAW, PLI–LIT Database, \*14–15. Among the costs of a product, direct or indirect, are the costs of risk management.

One important argument generally advanced for imposing strict liability is that the manufacturers and distributors of defective products can best allocate the cost of injuries resulting from those products. The premise is that the price of the product should reflect all its costs, including the cost of injuries caused by the product. Those manufacturers and distributors can incorporate the cost in the price of the product. The cost of the product will thus be borne by all those who profit from it, including manufacturers and distributors who profit from its sale, and buyers who profit from its use. The policy considerations underlying those principles include the relative bargaining power of the parties and the allocation of the loss to the better risk-bearer in a modern marketing system. *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 *N.J.* 555, 576, 489 *A.*2d 660 (1985).

The theory of insurance is that of transferring risks. Insurance companies accept risks from manufacturers and either retain the risks or spread the risks through reinsurance. John A. Appleman & Jean Appleman, 13A *Insurance Law and Practice* § 7681 (1976). Because insurance companies can spread costs throughout an industry and thus achieve cost efficiency, the law should, at a minimum, not provide disincentives to parties to acquire insurance

when available to cover their risks. Spreading the risk is conceptually more efficient.

Almost all such insurance controversies are retrospective, and to reflect now on what might have been done if the parties had contemplated today's problem is almost fatuous. Our job, however, is not just to solve today's problems but to create incentives that will tend to minimize their recurrence. "[T]o send the correct signals to the economic system, a judge must appreciate the consequences of legal decisions on future behavior." Hallett & Berney, *supra*, at *15. Future actors would know that if they do not transfer to insurance companies the risk of their activities that cause continuous and progressive injury, they may bear that untransferred risk.

To return to our hypothetical of the building occupants, the *Keene* rule of law reduces the incentive of the property owners to insure against future risks. Recall the circumstances in the final three years: The exposure had taken place and some symptoms of disease had occurred, but grave cases of injury had not yet arisen. Assuming the availability of insurance, a principle of law that would act as a disincentive to the building owners in the hypothetical might serve in the long run to reduce the available assets to manage the risk. O–I's counsel counters that these are not correct assumptions about the way in which the "real world" responds. We cannot be sure that the policy will be effective. We believe, however, that the policy goal is sound.

Finally, principles of simple justice cannot be entirely discounted. To rebut effectively the question posed in *Forty–Eight Insulations* is difficult:

> Were we to adopt [the policyholder's] position on defense costs a manufacturer which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as a manufacturer which had coverage for 20 years out of 20. Neither logic nor precedent support such a result.
>
> [633 *F*.2d at 1225.]

O–I emphasizes that its policies were in effect for eight years, but the principle that it advocates would apply if the policies had been in force for one day.

## VI

## The Remedy That We Propose

■ The final question that we must address, however, is whether our proposed solution will be an efficient response to the problem of insurance coverage for long-term environmental damage. The court in *Forty–Eight Insulations*, aptly described the challenge:

> The only thing on which all parties agree is that there is a need for us to arrive at an administratively manageable interpretation of the insurance policies—one that can be applied with minimal need for litigation. Reaching such a beneficial result is certainly desirable, but it greatly complicates our task. In the real world, there are few Solomonian possibilities.
>
> [*Id.* at 1218.]

One thing is certain: The present system is inefficient. " '[T]he largest transaction cost today is money being spent by insurance companies and industry making claims. [The cost is estimated] at about $500 million annually. These are the litigation costs between insured and insurers.' " Hallett & Berney, *supra*, at \*21–22 (quoting testimony of Doctor Joel Hirschhorn before a Congressional Subcommittee). "The legal costs of environmental coverage litigation today may run as high as 70 percent of total cleanup costs." Eugene R. Anderson & Giovanni Rodriguez, *Settling Environmental Coverage Disputes: What You Know About Your Enemy Cannot Hurt You in* Environmental and Toxic Tort Claims: Insurance Coverage in 1991 and Beyond 383 (PLI Comm. Law & Practice Course Handbook Series No. 579, 1991), *available in* WESTLAW, PLI–COMM Database, \*3. Concededly, legal disputes have necessarily preceded the cleanup work under new and complex laws like CERCLA, and once the rules are settled, litigation costs may decline. Hallett & Berney, *supra*, at \*22. Still, the present rules do not seem to be working.

We will not attempt a universal resolution of all issues of coverage for gradual release of pollutants or toxins. At least in the context of asbestos-related personal injury and property damage, the rules that we adopt will attempt to relate the theory of a continuous trigger causing indivisible injury to the degree of risk

transferred or retained in each of the years of repeated exposure to injurious conditions. In the absence of a satisfactory measure of allocation (as in the *Uniroyal (Agent Orange )* case, *supra*, 707 *F.Supp.* at 1391–93), we believe that straight annual progression is not an appropriate measure of allocation. The degree of risk transferred or retained in the early years of an enterprise like O–I's obviously was not at all comparable to that sought to be insured in later years. Hence, any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure. We believe that measure of allocation is more consistent with the economic realities of risk retention or risk transfer. That later insurers might need to respond to pre-policy occurrences is not unfair. "These are 'occurrence' policies which, by their nature, provide coverage for pre-policy occurrences (acts) which cause injury or damage during the policy period." *Montrose Chem. Corp. of California v. Admiral Ins. Co.*, 25 *Cal. App.*4th 1503, 5 *Cal.Rptr.*2d 358, 367, *review granted,* 24 *Cal. Rptr.*2d 661, 862 P.2d 661 (1992). In this case, the year-by-year increase in policy limits must have reflected an increasing awareness of the escalating nature of the risks sought to be transferred. We believe that a better formula (putting aside for a moment the problem of periods of self-insurance) is that developed in California. In *Armstrong World Industries, supra,* 26 *Cal.Rptr.*2d at 57, the court allocated the losses among the carriers on the basis of the extent of the risk assumed, *i.e.,* proration on the basis of policy limits, multiplied by years of coverage.

To explain the concept, we return to our example of the office-building workers. If we were to accept the constant levels of the policy limits as evidence of constant risks assumed over the nine-year span from exposure to manifestation (in the case of disease manifested in the ninth year), the carriers on the risk in years four, five, and six would each pay one-ninth of the loss, or collectively thirty-three percent. If the facts of coverage had been otherwise—let us say policies had been in effect for years one through three in the amount of two million per year and in years four through six at three million per year—we might assess the

risk assumed in years seven through nine at four million per year. Carriers during the first three years would bear roughly twenty-two percent (6/27ths); carriers covering the middle three years would bear thirty-three percent (9/27ths); and the building owners would bear forty-four percent of the risk (12/27ths). Of course, policy limits and exclusions must be taken into account. We recognize that such even mathematical proportions will not occur, and so we must repose a substantial measure of discretion in a master who must develop the formula that fairly reflects the risks assumed or transferred.

We realize that many complexities encumber the solution that we suggest involving, as it does, proration by time and degree of risk assumed—for example, determining how primary and excess coverage is to be taken into account or the order in which policies are triggered. *See* Hickman & DeYoung, *supra*, at 310–11; Roger Westendorf & Ronald R. Robinson, *Insurance Coverage for Environmental Claims Under the Comprehensive General Liability Policy, in* Pollution Liability: Managing the Challenges of Coverage and Defense in 1991, at 57 (ALI–ABA Video Law Review Study, Q205, 1991), *available in* WESTLAW, ALI–ABA Database, *54–57 (each discussing various theories of horizontal and vertical stacking and relationship to excess coverage issues). The parties did not focus on those issues. Still, we do not believe that the issues are unmanageable. Constructing the model for analysis of the self-insurance portion of the risk assumed by O–I is difficult but not impossible. We recognize the difficulties of apportioning costs with any scientific certainty. However, the legal system "frequently resolves issues involving considerable uncertainty." *SL Indus., Inc. v. American Motorists Ins. Co.*, 128 *N.J.* 188, 216, 607 *A.*2d 1266 (1992).

This case is undoubtedly more difficult to manage than most because of the great number of claims involved. On the other hand, the record is reasonably well-developed on the measure of risk assumed or transferred, at least since 1963. To extrapolate back from 1963 to establish a rough measure of the risk assumed

or retained in the years from 1948 to 1963 should not be difficult. A rough measure is all that we can achieve in this imperfect resolution of these issues. Moreover, we do not have a sense of the extent to which exposures date back to 1948 or to other periods before 1963.

In addition, we are informed that Aetna has paid its policy limits for the years 1963 to 1977, so that Aetna's policy proceeds will not be called on for future contribution. If that be so, rather than go back to revisit Aetna's contributions, we shall start forward and treat pending matters from the perspective of one having a long view of the entire occurrence (the extended accordion). Because of the large number of claims of asbestos exposure, the net effect of proration may simply be to cover more cases with partial indemnity in each case, rather than to cover fewer cases with full indemnity.

On remand, coincident with resolving the other coverage issues, the court shall appoint a master, one skilled in the economics of insurance, to create a model for allocating the claims. Above all, the master should develop a workable system for efficient assignment and administration of the claims. Because the defendants refused to involve themselves in the defense of the claims as presented, they should be bound by the facts set forth in the plaintiff's own records with respect to the dates of exposure and with respect to the amounts of settlements and defense costs. See Kahn, *supra*, at 612 (describing the remand procedure in *Keene*). Those losses for indemnity and defense costs should be allocated promptly among the companies in accordance with the mathematical model developed, subject to policy limits and exclusions. We stress that there can be no relitigation of those settled claims. Exact dates of exposure may not now be available. Available data should enable the master to grasp the generality of the underlying claims and the exposures involved. (Even under the *Keene* formula exposure dates were necessary to determine contribution.)

These cases, like the underlying environmental cases to which they are related, demand special attention, such as the use of

special case calendars, management conferences, monitoring, alternative methods of dispute resolution, or other specialized treatment. Some techniques and specifics of such case management are set forth in the *Report of the Supreme Court Committee on Environmental Litigation,* March 23, 1990, at 11–32, 36–38. And management can do more to resolve those issues itself. A case history of such an effort by Champion International Corp. to resolve disputes with sixty-three of its insurance carriers is in John H. Gross, *Strategic Considerations in Coverage Litigation, in* 11th Annual Insurance, Excess, and Reinsurance Coverage Disputes 7 (PLI Litig. & Admin. Practice Course Handbook Series No. 494, 1994), *available in* WESTLAW PLI–LIT Database. "The settlement was reasonable and the parties saved millions of dollars in litigation expense and thousands of hours of management time." *Id.* at *2.

In future cases, insurers aware of their responsibility under the continuing-trigger theory might minimize their costs by assuming responsibility for or involving themselves in the defense of the actions with the ultimate allocation of costs to be determined in accordance with the same general formulas. *See R.* 4:42–9(a)(6) (allowing counsel fees in actions on indemnity policies). If, after experience, we are convinced that our solution is inefficient or unrealistic, we will not hesitate to revisit the issue. "We do not expect that this case will be the 'last word' in this area. Environmental liability insurance law, like any other area of law, will have to develop over time and trial courts must be flexible in responding to new fact situations." *Northern States Power Co., supra,* 523 *N.W.*2d at 665.

## VII

To recapitulate, we hold that when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous-trigger theory

for activating the insurers' obligation to respond under the policies.

 Although the use of a continuous trigger for property damage attributable to long-term embedding of contaminants is more problematic (for example, the "property damage" may be attributable only to third-party intervention, as in the form of a government order to rip out material previously thought not to be defective), the latent nature of such property damage, at least in the case of asbestos products, is sufficiently analogous to that in personal injury to warrant use of a continuous trigger under the terms we have outlined. We need not resolve in these cases exactly when the continuum ends in the contexts of bodily injury and property damage.

 Because multiple policies of insurance are triggered under the continuous-trigger theory, it becomes necessary to determine the extent to which each triggered policy shall provide indemnity. "Other insurance" clauses in standard CGL policies were not intended to resolve that question. A fair method of allocation appears to be one that is related to both the time on the risk and the degree of risk assumed. When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable. Estimating the degree of risk assumed is difficult but not impossible. Insurers whose policies are triggered by an injury during a policy period must respond to any claims presented to them and, if they deny full coverage, must initiate proceedings to determine the portion allocable for defense and indemnity costs. For failure to provide coverage, a policyholder may recover costs incurred under the provisions of *Rule* 4:42–9(a)(6). Policyholders must cooperate in furnishing information concerning coverage. Courts must take an active role in the management and resolution of such coverage controversies. A trial court may repose a large measure of discretion in a special master to aid the court in developing a formula for allocation of the costs of defense and indemnity. *R.*

4:41–2. Masters should use specialized procedures to resolve the issues. Ultimately, insurance companies are in the best position to hold down their costs. They are the most skilled in claims management and claims disposition. Data in the record suggest that in some years defense costs exceeded claims paid. Courts cannot simplify issues that are intrinsically complex. We can, however, narrow the range of disputes and provide procedures better to resolve the disputes that remain. If we can accomplish that much, we can better channel the available resources into remediation of environmental harms.

## VIII

The judgment of the Appellate Division is reversed insofar as it allocated none of the costs of indemnity or defense to periods of no insurance and otherwise directed contribution under the "other insurance" clauses of the policies. The matter is remanded to the Chancery Division for further proceedings in accordance with this opinion.

*For reversal and remandment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*–None.