**GLACIER GENERAL ASSURANCE COMPANY, Plaintiff,**

v.

**CONTINENTAL CASUALTY CO., Defendant.**

Civ. A. No. 83–1703.

United States District Court, District of Columbia.

March 19, 1985.

Richard W. Boone, Lori J. Lustig, Todd S. Deckelbaum, Wilkes, Artis, Hedrick & Lane, Chartered, Washington, D.C., for plaintiff.

James W. Greene, Bromley, Brown & Walsh, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

At issue before the Court on cross-motions for summary judgment is a dispute between two insurance carriers over which of the two companies shall ultimately bear the expense of the settlement of a malpractice claim against a podiatrist, Dr. Love, who was insured by the two companies during consecutive time periods. Counsel have done an excellent job of briefing and arguing the case, and the Court has reviewed the extensive filings and underlying documentation including the depositions of the parties' expert witnesses. A detailed examination of the factual setting of this case is not necessary, but, briefly stated, the undisputed facts are as follows.

Dr. Love, a licensed podiatrist, was insured under a professional liability policy issued by plaintiff Glacier General Assurance Company (Glacier) from April 1, 1977 to March 31, 1981. Dr. Love's professional liability insurance policy from March 31, 1981 to March 31, 1982 was issued by the defendant, Continental Casualty Company (Continental).

Phillip Cephas, a patient of Dr. Love from June 1979 until July 1981, had his legs amputated on September 29, 1981 and July 30, 1982 allegedly as a result of Dr. Love's professional errors or neglect. Mr. Cephas filed a malpractice suit against Dr. Love in this Court and the parties to the present action jointly undertook the defense of Dr. Love until such time as the issue of responsibility for coverage could be determined. On April 6, 1983, Mr. Cephas released his claims against Dr. Love for the sum of $500,000, which was provided by equal contributions from each carrier. The present lawsuit was subsequently

filed in which both parties seek to recover their one-half contribution to the defense and settlement of Mr. Cephas' claim.

■ At the outset, it is obvious that Mr. Cephas was *treated* by Dr. Love during the coverage period of both companies. It is equally obvious that Mr. Cephas suffered the *injury* (the amputation of his right leg) during the Continental coverage period. However, the test for coverage is not so simple. In order to determine which of the two carriers is liable, the Court must first turn to the language of the policies in question. The insurance policy issued by Glacier provides, in pertinent part, that Glacier would pay

> ... all sums of money which ... [Dr. Love] shall become legally obligated to pay as damages ... for bodily injury ... suffered by any person during the policy period, arising as the result of the professional services rendered or which should have been rendered by ... [Dr. Love].

The policy issued by Continental to Dr. Love provides, in pertinent part, that Continental was obligated to pay

> ... all sums which ... [Dr. Love] shall become legally obligated to pay as damages because of injury ... caused by medical incident which occurs during the policy period, in the practice of ... [Dr. Love's] profession.

The policies are similar, not only in coverage, but in premiums and limits, but they are not identical. The Glacier policy is triggered by "damages ... for bodily injury ... suffered by any person during the policy period...." Continental is triggered not by injury but by "medical incident [resulting in injury] which occurs during the policy period."

According to the expert testimony, Mr. Cephas' ultimate physical injury—the amputation of his legs—was the result of progressive vascular disease. In the course of oral argument, both counsel conceded that the negligence of Dr. Love—insofar as his failure to properly diagnose constituted negligence—continued throughout the period of treatment. They would also agree that an earlier diagnosis of vascular disease might have prevented the amputation from becoming necessary.[1]

The parties do not agree however as to the legal significance of these facts.

Defendant Continental has argued that Dr. Love should have made his diagnosis during the Glacier coverage period because the disease was "obvious" as early as the summer of 1979 and that by January of 1981 there were "numerous classic symptoms" of progressive vascular disease. The defendant further suggests[2] that by early May, 1981, the disease had sufficiently progressed so that amputation was "inevitable."[3] The defendant argues that prior to March 31, 1981, there was a "substantial possibility of a better result for Mr. Cephas which was destroyed by the continuing negligent failure to diagnose...." Thus, according to Continental, Mr. Cephas suffered bodily injury during the Glacier coverage period when Dr. Love's negligent failure to diagnose "allowed his vascular disease to progress unnoticed to a critical point."

Plaintiff, unsurprisingly, sees the facts in a different light. Plaintiff agrees that the disease in question was progressive and that there was a "negligent exposure" to the disease over a period of time. However, according to Glacier, "Dr. Love could not have discerned the underlying illness ... any more than two or three months ... prior to the culmination of the disease in July." Although plaintiff admits that "[one] could find that the injury to Mr. Cephas was continuing in nature and occurred during both policy periods," Glacier suggests that it would be more appropriate

---

**1.** All of the positions and opinions attributed to the parties are supported by the expert testimony of one or more physicians.

**2.** Plaintiff's counsel and his experts have also expressed agreement on this point.

**3.** The disease was correctly diagnosed in July, 1981.

to focus on the period when the disease was "obvious" yet undiagnosed—from May to July, 1981—and when the continuing negligence culminated in the injury-producing "medical incident" of amputation. In other words, Glacier places the operative events solely within the Continental coverage period.

Both parties would no doubt agree that it would be difficult if not impossible to fix a point in time when the "injury" to Mr. Cephas occurred. In fact, for purposes of accuracy, one would want to draw two lines: the first at the point when the non-diagnosis became "negligent" and began the chain of causation that led to the operation, and the second at the point where amputation became inevitable. It was during this time period that the "medical incident" (Continental's triggering term) of negligent treatment (non-diagnosis) was causing injury (Glacier's triggering term) to Mr. Cephas as his vascular disease progressively worsened.

The Court, of course, cannot pinpoint this period of time, but it can say with some confidence that the conduct which proximately caused the injury in this case overlapped the coverage period of both carriers.[4] Based on this factual finding—which was not seriously disputed by the parties[5]—the Court holds that the coverage of both parties was triggered in this case.

■ A finding of dual coverage raises the further issue of how the liability for the loss should be apportioned between the two carriers. Plaintiff Glacier has argued that the method of apportionment is dictated by the law of this Circuit established in *Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir. 1981).

In *Keene*, the court considered the liabilities of various insurers for damages incurred by their insured, an asbestos manufacturer, in products liability litigation resulting from asbestosis and other related diseases. The court held that the coverage of any or all of the insurance carriers was triggered by "inhalation exposure, exposure in residence, [or] manifestation" during the policy period. *Id.* at 1047. In short, the court construed the companies' coverage as broadly as possible "in order for Keene's rights under the policies to be secure." *Id.* at 1046. The court also held that in order to "secure [the] function of relieving Keene of all risk of liability," any insurer whose coverage is triggered would be held liable to Keene up to the policy's limits.

With respect to the allocation of liability between the companies, the court held that "Keene [will] be able to collect from any insurer whose coverage is triggered the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury. That is the only way that Keene can be assured the security that it purchased with each policy." *Keene* at 1050. As one can

---

**4.** The Court finds this to be the relevant time period for both carriers despite the difference in triggering language. This "critical" period represents the time—neither too early nor too late—when the "medical mismanagement" of the case was a "substantial factor" in bringing about the ultimate result. *See Daniels v. Hadley Memorial Hospital,* 566 F.2d 749, 757 (D.C.Cir. 1977). The continuing misdiagnosis involved here is analogous to a concurrent cause case in that the cumulative effect of Dr. Love's failure to diagnose in some or all of Mr. Cephas' approximately forty visits contributed in some unquantifiable measure to the ultimate injury. Some of those visits occurred under Glacier's coverage and some occurred under the Continental policy.

**5.** As noted earlier, Glacier admits "negligence" during its coverage period but denies injury. However, as noted above, each negligent act of misdiagnosis contributed to the injury as the disease progressed.

Defendant also admits to negligence in its coverage period, but argues for no "injury" because it was "too late." Given the facts as established, no expert has testified conclusively that by April 1, 1981, Mr. Cephas was suffering from an inoperable condition, and the Court does not find this argument convincing. On the contrary, several medical incidents (i.e., misdiagnoses) occurred and may well have contributed to the injury to Mr. Cephas during Continental's coverage period.

see, both the holding and language of *Keene* strongly suggest the purpose of the court's decision: to insure that the liability coverage cast a broad enough net to protect the asbestos manufacturer and, consequently, the victims of asbestos-related diseases.[6] This Court does not believe that the *Keene* holding—designed to maximize coverage in a unique liability situation—can be applied across the board to all situations of multiple coverage.

Glacier, however, argues that *Keene* is applicable and that application of the *Keene* holding results in Glacier's release from all liability. Based on the Keene court's holding that the allocation of liability will be governed by the provisions of the policies (i.e., "other insurance" clauses), Glacier argues that Continental is liable for the *full amount* of the settlement under the terms of the following clause of Glacier's policy:

> If other valid insurance exists at any time protecting against a loss covered by this policy, this policy shall be null and void with respect to said loss....

Glacier reasons that because Continental's policy protects against the same "loss" (i.e., Mr. Cephas' injuries resulting from their insured's alleged malpractice), its own policy is "null and void" and the full liability is Continental's.

However, even if the *Keene* opinion on insurance allocation was not *sui generis*, this Court finds that the case at bar is distinguishable on several grounds. Thus, assuming *arguendo* that *Keene* is broadly applicable as suggested by plaintiff, the allocation suggested by Glacier is nevertheless inappropriate.

First, the language of the Glacier policy [7] is only operative if other valid insurance protects against a *"loss covered by* [the *Glacier* ] *policy."* [8] As noted above, the injury occurred in both policy periods. Although the "loss" cannot be scientifically apportioned, there is nothing to suggest that *Continental's* policy applies to the indivisible *portion* of the *"loss* covered by [the *Glacier* ] *policy."* Under a strict reading of the Glacier policy the "null and void" provision is not activated by the facts of this case.

Second, this is not a situation where one carrier (i.e., Glacier) has issued an "excess" or "umbrella" type policy, while another (i.e., Continental) has assumed the greater risk of providing primary coverage. *See* 3 R. Long, The Law of Liability Insurance §§ 22.06, 22.07A (1981). Aside from some innocuous matters, the Glacier and Continental policies are identical. Both provide the same amount of liability protection for the same type of claim for virtually identical costs.[9] Yet, if Glacier were really providing an "excess" policy or some type of

---

**6.** The court noted that the unique nature of the asbestos litigation—with over 6000 cases then pending against Keene—rendered much of traditional insurance law inapplicable. For example, the Court reversed the traditional burden of proving coverage, noting that:

> [T]he injuries in this case ... are unique and traditional procedural rules cannot be allowed to defeat Keene's or its insurers' substantive rights under the policies.... We believe ... that this case is so different from the cases in which the insured's burden of proof developed, that those cases provide no authority for this case.

*Keene*, at 1052, n. 42. The "unique" facts and issues of *Keene* raise substantial questions as to the applicability of the decision in the instant case.

**7.** As noted *supra*, Glacier relies heavily on the one paragraph in its policy which provides that: "if other valid insurance exists at any time pro-

tecting the insured against loss covered by this policy, this policy shall be null and void with respect to said loss...." Glacier insists that *Keene* requires the Court to give effect to this contractual language, often referred to as an "escape" clause, and allocate the total loss to Continental.

**8.** In other words, this is not a case in which a harm—such as an automobile accident—is covered by two policies. This is a case in which the harm, or injury, is spread over time into two periods of separate insurance coverage. In the first case both policies undisputably cover the whole loss. In the second, the loss is divided between two policies.

**9.** The premium for the Glacier policy from April 1, 1980 to April 1, 1981 was $3,308.00. The premium for the Continental policy from March 31, 1981 to March 31, 1982 was $3,376.00.

"secondary" coverage, one would expect its premium to be significantly lower to reflect its lower risk.

Third, this is not a case, such as in *Keene*, where an insured is litigating coverage issues against multiple insurers. This case is in the very different posture of litigation of coverage issues between insurers. In such a case, there is no contract, or other agreement, between the parties to this litigation that the Court may turn to as a primary source. Instead the Court must examine the parties' rights and liabilities in light of their contracts with a mutual third party (their insured). Viewed in this light it is inequitable and somewhat arbitrary to bind Continental to an ambiguous clause in a contract between its insured, Dr. Love, and his previous insurer.

Fourth—and most important—the existence of the "other insurance" language of the Glacier policy does not negate the "other insurance" provisions of the Continental policy.[10] As Glacier correctly points out, the Continental policy provides that "[t]he insurance afforded by this policy is primary insurance...." However, the policies at issue are consecutive and not concurrent, and as previously noted, both policies may be considered "primary" within their coverage period. The Continental policy goes on to provide that "[w]hen both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall ... be liable [as set forth below]." The contract then sets forth two formulas; "contribution by limits" is applicable when, as in the present case, the "other insurance does not provide for contribution by equal shares...." Giving effect to the language of the Glacier policy would require this Court to ignore the Continental policy's contrary provision on the allocation of other insurance. Where, as here, the terms of the two poli-

cies are repugnant, it is not appropriate to merely give effect to one policy or the other. *See infra* pages 131–132. Instead the Court must read out the repugnant clauses and decide the case on the basis of the remaining language and the applicable law.

Thus, for the reasons above, as well as this Court's belief in the limited scope of the *Keene* opinion, the Court will deny Glacier's motion for summary judgment predicated on the argument that the entire loss must be allocated to Continental according to the terms of Glacier's "other insurance" clause.

■ The denial of Glacier's motion still leaves the issue of allocation open. As noted above, the two policies are in conflict on this issue and the "injury" or "loss" is incapable of accurate apportionment between the relevant time periods. In sum, this case is factually distinguishable from the usual multiple coverage case[11] and there is no obvious method for dividing the "loss."

The Court is not completely without guidance, however. For example, the Oregon Supreme Court considered the problem of apportionment where one of two automobile liability policies contained an "excess insurance" provision and the other policy contained a "pro rata" distribution provision. *Lamb-Weston, Inc. v. Oregon Automobile Ins. Co.*, 219 Or. 110, 341 P.2d 110 (1959). Recognizing the repugnancy of the two clauses, the Court examined the various rules of law and interpretation adopted by the courts in reconciling such conflicting language. The court declined to adopt any of the various rules and held that in such a situation the insurers should share the loss proportionately. The court reasoned that such repugnant clauses could not in fact be reconciled and rather than

10. Insurance law refers to this situation of conflicting policies as an issue of "mutually repugnant" clauses. *See* 3 R. Long, The Law of Liability Insurance § 22.08 (1981) (discussing various judicial approaches to problem of repugnancy in multiple coverage situations).

11. An example of a typical multiple coverage case is the situation where a loss is incurred by an insured driver while driving an automobile of an insured owner with the owner's permission. 3 R. Long, the Law of Liability Insurance § 22.01 (1981). In such a case both policies clearly cover the entire loss.

attempting to do so, both clauses should be rejected. *See also Cosmopolitan Mutual Ins. Co. v. Continental Casualty Co.*, 28 N.J. 554, 147 A.2d 529 (1959) (when "excess insurance" provisions are mutually repugnant, they become "inoperative" and "each company is obligated to share in the cost of the settlement and expenses." 3 R. Long, The Law of Liability Insurance § 22.08 (1981) (discussing *Lamb-Weston* and citing other cases).

Other courts have adopted a variety of "artificial and forced rules" for determining the liability of multiple insurers. *See id.* Some courts shift the liability to the insurer of the primary tortfeasor; other courts fix liability on the insurer whose contract is deemed the "most specific" or the insurer who was first in time of issuance.

This Court does not believe that any of these formulas reach the central issue involved—the language and intent of the parties. *See Woodrich Construction Co. v. Indemnity Insurance Co.*, 252 Minn. 86, 89 N.W.2d 412 (1959) ("the decision must rest upon a construction of the language employed by the respective insurers and not upon ... any other arbitrary rule or circumstance"). Obviously, the two policies are drafted without reference to each other and, in many circumstances, the underwriter will not have been able to anticipate the conflict. In such a case, speaking of the particular "intent" of the insurer is meaningless, and the language of the repugnant other insurance clauses should be rejected as a basis for decision.

Although the present case may be distinguished from many of the "other insurance" cases discussed above, in that those cases deal with two policies that clearly cover a single loss, whereas the present case involves a loss "divided" between two policies, the Court finds the holdings in those cases instructive. It is generally held that when the conflicting clauses are ignored, as they must be, the Court should—in the absence of other grounds for distinguishing the policies—evenly prorate the loss between the two insurers.

*See United States Fidelity & Guarantee Co. v. Liberty Mutual Ins. Co.*, 327 F.Supp. 462 (M.D.Pa.1971) (loss prorated based upon maximum limits of each policy where provisions of policies mutually repugnant); *Cosmopolitan Mutual; Lamb-Weston, supra.*

This outcome is further supported by local precedent providing for equal distribution of the loss where the time of the loss cannot be established with sufficient precision to place it within one of the two coverage periods. *Transamerica Insurance Co. v. Diplomat Parking Corp.*, 282 A.2d 564 (D.C.1971). The court in *Transamerica* noted that the liability rule adopted in that case closely paralleled the liability of joint tortfeasors. *Id.* at 566 (*citing Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948); *Ybara v. Spangard*, 25 Cal.2d 486, 154 P.2d 687 (1944); Restatement (Second) of Torts § 433B (1965)). This analogy is appropriate in the present action as well. The parties in this case, through their contracts of insurance, assumed liability for the acts of their insured within the relevant coverage periods. In this case, the negligent acts of the insured in the Glacier coverage period together with the negligent acts of the insured in the Continental coverage period *jointly* resulted in indivisible injuries to Mr. Cephas. Because the insurers "assume" liability for the actions in the two different time periods, their position is analogous to two persons whose separate acts resulted in an indivisible injury to Mr. Cephas. If the two insurers were tried as defendants in a tort action arising from such an injury their liability would be joint. In the present case, the insurers' liability, based on their contractual obligations, should also be joint. Absent a more accurate means of apportioning this joint liability, the parties must make equal contributions towards the total damage award.

Because the Court is aware that the parties have already made equal contributions to the settlement, no further distribution is necessary. The proper allocation of liability is the *status quo*. An appropriate Order will issue in accordance with the terms of this opinion.

## ORDER

In accordance with the Memorandum Opinion issued this 19th day of March, 1985, it is hereby

ORDERED that:

1) Plaintiff's Motion for Summary Judgment is denied;

2) Defendant's Motion for Summary Judgment is denied;

3) The above-captioned case shall be, and is, dismissed.